#25001-a-SLZ

**2010 S.D. 85**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                                    Plaintiff and Appellee,

    v.

JAMIE COREAN,                                              Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE FOURTH JUDICIAL CIRCUIT
BUTTE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JOHN W. BASTIAN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

FRANK GEAGHAN
Assistant Attorney General                    Attorneys for plaintiff
Pierre, South Dakota                          and appellee.

DAVID L. CLAGGETT                             Attorney for defendant
Spearfish, South Dakota                       and appellant.

* * * *

ARGUED ON AUGUST 25, 2010

OPINION FILED **11/03/10**

#25001

ZINTER, Justice

[¶1.] Jamie Corean was convicted of accessory to murder and aiding and abetting aggravated kidnapping. After the conviction but before we considered her appeal, the principal in the murder and kidnapping provided testimony claiming that Corean had no knowledge of or involvement in the offenses. As a result of the new evidence, we remanded the matter to the circuit court for supplementation of the record, further discovery, and consideration of a motion for new trial. Following an evidentiary hearing, the circuit court denied relief. The court found that the new evidence would not have produced an acquittal or changed the outcome of the trial because the principal's testimony was irrelevant, biased, not reasonable, and lacked credibility. Corean now appeals the denial of her renewed motion for new trial and motion for judgment of acquittal. She also argues that the circuit court erred in: admitting co-conspirator statements; instructing the jury; finding that there was sufficient evidence to support the convictions; and, in imposing a mandatory life sentence. We affirm.

*Facts and Procedural History*

[¶2.] On Monday, July 12, 2004, Troy Klug and Robert Highley went to Cynthia Kindall's home in Rapid City to acquire methamphetamine. Duana Beebe, Klug's girlfriend, testified that Klug wanted "to get [the] drugs as a front"[1] so he could repay a drug debt to Kindall. Kindall was also Beebe's drug supplier. The

---

1. Beebe testified that a front is "when someone will give [another person] drugs without a money transaction and then they repay [the person who gave them the drugs] after they make money off of the drugs."

-1-

record reflects that Tory Tiegen was present, he had been residing in Kindall's house, and Klug's proposed drug purchase was part of an ongoing course of illegal drug trafficking at this house involving both Tiegen and Kindall.

[¶3.]     When Highley and Klug arrived, they met Kindall and Tiegen. Highley was asked to leave, and he left in Klug's vehicle. Kindall left shortly thereafter. When Kindall returned she observed that Klug was alive, but Tiegen had bound Klug with duct tape. Kindall and Tiegen loaded Klug into the trunk of Kindall's car (a black Nissan) and left.

[¶4.]     Tiegen and Kindall arrived at Beebe's house that Monday evening around 9:00 p.m. Beebe asked Kindall where Klug was, and Kindall responded that she had kicked Klug out of her house. Beebe asked Kindall and Tiegen to leave.

[¶5.]     James Kusick testified that Tiegen arrived at Kusick and Corean's house ("Corean's house") in Belle Fourche on Tuesday morning, July 13, between 6:00 and 7:00 a.m. Tiegen drove Kindall's car into the garage, and once inside, Tiegen opened the trunk. Klug was in the trunk and was bound with duct tape. According to Kusick, Klug "couldn't see, his arms were duct taped, his legs were duct taped." Tiegen pulled Klug out of the trunk and "threw him on the floor." Tiegen indicated that Klug was "a rat, a snitch." Tiegen then kicked Klug in the stomach, and Kusick "heard [Klug] moan." When Kusick went back inside the house, he told Corean that Tiegen "had somebody with him." Corean did not suggest that they should intervene.

[¶6.]     Tiegen testified that he put Klug in a tool box in the garage at Corean's house that morning. Kusick testified that he "wanted nothing to do with" the

situation, and he left for work. Corean indicated in prior testimony from Tiegen's trial that after she went to work, she returned to see if Tiegen was gone.[2] When she saw that Tiegen was gone, she locked the garage.

[¶7.] On the way home from work that afternoon, Kusick told Eric Haar that Tiegen had left Klug at Corean's house. Kusick asked Haar to check the tool box in the garage. Kusick testified that Haar opened the tool box, and Kusick "was standing by the door and [he] could see somebody in it." Kusick testified that when Corean arrived home after work that afternoon, "I remember us telling her that [Tiegen] left this guy here and he's still here." According to Kusick, Corean did not suggest that someone should check on Klug's well-being.

[¶8.] Abby DeJong, Corean's best friend, testified that she arrived at Corean's house on Tuesday, July 13, around 6:30 p.m. Corean told DeJong that Tiegen had put a person in a box in her garage. DeJong testified that Corean also told her that the person was being "held against [his] will." When DeJong told Corean, "I think we need to do something," Corean responded: "No, the cops will get them." When DeJong attempted to convince Corean to call the police, Corean told her: "No, you're not going to." When DeJong told Corean that if DeJong were in the tool box, she "would want someone to help me," Corean again replied: "No, the cops will get them."

[¶9.] Tiegen and Kindall returned to Corean's house late Tuesday evening. DeJong testified that when Tiegen and Kindall arrived, they had drugs with them

---

2. The State introduced Corean's prior testimony.

and everyone – Tiegen, Kindall, Haar, DeJong, and Corean – began using methamphetamine. According to DeJong, she asked Tiegen in Corean's presence why Tiegen was keeping Klug in the tool box. DeJong testified that Kindall spoke up and stated "that Klug had owed them money." Tiegen and Kusick went for a ride later that evening, and when they returned to Corean's house, Corean, DeJong, Haar, and Kindall were still together in the living room using drugs. Before going to bed that evening, Kusick saw Tiegen and Corean talking together in the kitchen.

[¶10.]    Tell Cook also lived in Belle Fourche. He testified that Tiegen and Kindall arrived at his house around 2:00 a.m. on Wednesday morning, July 14.[3]

---

3.    The exact day when Tiegen first arrived at Cook's house – Tuesday or Wednesday – was disputed. At Corean's post-trial hearing, Tiegen testified that he and Kindall went to Cook's house on *Tuesday* morning, between 2:00 and 4:00 a.m. Once there, Tiegen testified that he "used some meth." According to Tiegen, he and Cook then drove Klug to a gravel road, "and scared him some." Tiegen testified that Cook "punched [Klug], kicked him, hollered at him some." Tiegen and Cook then put Klug back in the trunk of the car and returned to Cook's house. According to Tiegen, he and Kindall then went to Corean's house later Tuesday morning, "some[time] between 6:00 and 7:00."

At Corean's trial, Kindall also testified that she and Tiegen went to Cook's house on *Tuesday* morning, before going to Corean's house. Kindall conceded, however, that because she had been using drugs, she was not "certain of the days and dates during the time period," that she did not "remember the dates very well," and that she did not "remember Monday night; I don't remember the dates[.]"

Cook's testimony at Corean's trial was, however, unequivocal that Tiegen and Kindall arrived at his house on Wednesday morning, not Tuesday. Cook testified four different times that Tiegen first arrived early Wednesday morning. Cook was asked, "Is there anything you can think of or is there any reference that you have as to why it was early Wednesday morning?" Cook replied, "Because I was going on vacation, I had Friday off work and so that's a good reference point to this whole thing. I had plans to go to Denver to a race track and it was just two nights before that." Further, according to

(continued . . .)

According to Cook, Tiegen took Cook outside to Kindall's vehicle and showed Cook that Klug was in the trunk. Klug's hands, feet, and head were bound with duct tape, and he was lying face down in the trunk. Cook testified that Klug was still alive because he heard Klug moan and saw him reflex when Tiegen punched him in the back. Tiegen told Cook that he was either going to drive to Denver to turn Klug into Klug's parole agent, or he was going to drive to North Dakota and dig a hole to bury Klug.

[¶11.] Tiegen and Kindall returned to Corean's house around 5:30 a.m. Wednesday morning. Kusick testified that later that morning Tiegen told Kusick that Tiegen had "woke [Klug] up" and that Tiegen was leaving. Haar testified that he "remember[ed] asking [Kusick later], you know, what happened, was [Klug] okay or what's up and [Kusick] said that [Tiegen] told him that it took a while to get

_____

(. . . continued)

Cook, he and Tiegen never drove Klug to a gravel road, and Cook never struck Klug. Rather, Cook testified that after Tiegen showed Cook that Klug was in the trunk of the car, Cook allowed Tiegen and Kindall to stay at his house. When Cook left for work on Wednesday morning around 5:00 a.m., Tiegen and Kindall were still there.

The jury was required to resolve this factual dispute. From Cook's testimony, the jury could have found that Klug was still alive Wednesday morning. Even if Tiegen and Kindall were at Cook's house sometime Tuesday morning, there is no dispute that Tiegen went to *Corean's* house on Tuesday morning, and there is substantial evidence that Corean acquired knowledge on Tuesday that Klug was alive and being held against his will in the tool box in her garage.

[Klug] up, but he got him up."[4]  Before Tiegen left, he instructed Kusick to "wash the [tool] box out."  Kusick washed the tool box at a car wash but there was "absolutely nothing" inside the tool box to wash.  According to Kusick, "It had already been cleaned."

[¶12.]    On Wednesday evening, Kusick and Corean were at their house with DeJong and Haar.  According to Kusick, he "wanted to tell the cops," but "[w]e had a conversation that none of us would ever talk about it, we'd never say anything."  Kusick also remembered "hearing [Corean] say we need an alibi."  DeJong testified that when she talked to Corean on Wednesday, Corean informed DeJong that Tiegen was concerned about whether he could trust DeJong.  According to DeJong, Corean reassured Tiegen not to worry about DeJong, and that Corean would "take care of it."

[¶13.]    Tiegen returned to Cook's house the following morning, Thursday, July 15.  Tiegen told Cook that Tiegen had put Klug in the tool box, and that Tiegen had left Klug there all day.  When Cook asked Tiegen if he had given Klug any water, Tiegen replied: "No, I didn't give him any water, too late for that anyway."  Cook testified that Tiegen boasted that he went to the tool box several times during the day just to beat Klug.  He told Cook that he felt the bones crush in Klug's face and "that's what probably did him in[.]"

[¶14.]    Kindall and Tiegen left Belle Fourche for Montana on Thursday, July 15.  Kindall indicated that at that time, Klug was dead and still in the trunk of her

---

4.    Haar indicated that he was not sure when this conversation occurred, but that it was either Tuesday night or Wednesday.

car. Once in Montana, they drove into a canyon where Tiegen buried Klug by a fallen tree.

[¶15.] Tiegen was convicted of Klug's kidnapping, and on January 16, 2008, this Court affirmed the conviction in *State v. Tiegen*, 2008 S.D. 6, 744 N.W.2d 578. On November 18, 2008, Tiegen was indicted for the first-degree murder of Klug. Following plea negotiations, Tiegen pleaded guilty to first-degree murder. Before his guilty plea, he had been subpoenaed to testify at Corean's trial, but he exercised his Fifth Amendment right to remain silent. Corean was subsequently convicted of accessory to murder in violation of SDCL 22-3-5 and aiding and abetting aggravated kidnapping in violation of SDCL §§ 22-19-1(2) and 22-3-3. Following Corean's conviction and appeal to this Court, she moved for a judgment of acquittal or new trial based on newly obtained testimony Tiegen would then provide following his plea. We remanded the matter for the circuit court's consideration.

[¶16.] The circuit court conducted a hearing in which Tiegen testified. Tiegen claimed that Corean "never indicated" knowledge of the kidnapping. Tiegen also suggested that Klug was dead by the time Corean learned about Klug. Tiegen's credibility was, however, attacked by showing bias in favor of Corean.[5] Tiegen

---

5.    Tiegen testified:

> Q: Jamie Corean has been the only one that has never given
> evidence against you, hasn't she?
> A: I guess I can't really say that, I mean there's [sic] people in
> the courtroom that have evidence against me.
> * * *
> Q: One of the conditions of your plea agreement with the State
> was that we make an offer to Jamie Corean, correct?
> A: That was in this plea agreement, correct.

(continued . . .)

further acknowledged that Corean was home when Tiegen showed Kusick that Klug was in the trunk of the car. Tiegen finally acknowledged that he did not know if Corean went inside the garage at any time on Tuesday.

[¶17.] At the conclusion of the hearing, the circuit court denied Corean's motions for judgment of acquittal and new trial. The court found that Tiegen's testimony was biased and lacked credibility, and that it was merely cumulative and impeaching. The court ultimately found that Tiegen's evidence was insufficient to have produced an acquittal or changed the outcome of the trial.

*I. Whether Tiegen's post-trial testimony requires a new trial.*

[¶18.] Corean argues that the circuit court erred in denying a new trial because Tiegen's testimony was "highly reliable" and it "undermined confidence in the outcome of her trial." "To succeed on a motion for a new trial based on after-discovered evidence, a defendant must prove that '(1) the evidence was undiscovered by the movant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) that it would probably produce an acquittal; and (4) that no lack of diligence caused the movant to fail to discover the evidence earlier.'" *State v. Shepard*, 2009 S.D. 50, ¶ 20, 768 N.W.2d 162, 167 (quoting *State v. Reyes*, 2005 S.D. 46, ¶ 28, 695 N.W.2d 245, 255). "[N]ew trial motions based on newly discovered evidence request extraordinary relief; they should be granted only in

_____

(. . . continued)
> Q: You were rewarding her for her loyalty, weren't you?
> A: I wouldn't put it that way, I would put it in the fact that I felt she was wrongly convicted and I was doing what I could because I felt like she really got a raw deal.

exceptional circumstances and then only if the requirements are strictly met." *State v. Gehm,* 1999 S.D. 82, ¶ 15, 600 N.W.2d 535, 540. "Whether a new trial motion should be granted is left to the sound discretion of the trial court, and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion." *Id.* ¶ 12, 600 N.W.2d at 539.

[¶19.]     There is no dispute that Tiegen's testimony was not available and was undiscoverable by Corean at the time of trial. The circuit court, however, denied a new trial on requirements (2) and (3), finding that Tiegen's testimony was merely cumulative and impeaching, and that the evidence was insufficient to probably have produced an acquittal. We agree with the circuit court. Corean does not dispute the following findings indicating that Tiegen's testimony was merely cumulative and impeaching:

- Tiegen confirmed that he first went to the Corean residence on the morning of July 13, 2004. This fact was confirmed by Kusick and the testimony of DCI agent Brent Gromer who testified that Corean admitted that this had occurred.
- Tiegen confirmed the testimony of James Kusick that Tiegen had displayed Troy Klug to Kusick in Corean's garage on Tuesday morning and that Corean was present in the residence at this time.
- Tiegen confirmed that Troy Klug was alive on the morning of July 13, 2004, and that even later in the morning Troy Klug would have been well enough to walk away.
- Tiegen confirmed that after Kusick observed Troy Klug in the garage, Kusick left the garage and had a conversation with Corean.
- Tiegen testified that he left Troy Klug alive in Corean's garage on the morning of July 13, 2004, after Kusick and Corean left for work.
- Kusick testified that on the morning of July 13, 2004, he told Corean that Tiegen had someone that he was holding in the garage.

- Tiegen's testimony had no impact on the issue of Corean's knowledge of Troy Klug's presence in her garage at a time when Troy Klug was alive and at a time when Corean had an opportunity to intervene on Troy's behalf; the jury heard the evidence that Corean chose to provide a place for Tiegen to hold Troy Klug.

[¶20.]     The court also found that Corean's friends' testimony confirmed Corean's knowledge of Klug's confinement in her garage. The court noted: "DeJong and Haar testified that on Tuesday between 6:00 and 7:00 p.m., a conversation occurred on the porch of the Kusick/Corean residence and that Haar, DeJong and Corean discussed the presence of a person in a box in the Kusick/Corean garage." The court further noted that "DeJong testified that she told Corean more than one time that they should try to help the person being held in the garage and Corean refused." Finally, the court noted, "[w]hen Corean returned home on Tuesday, Kusick testified that he spoke with her and told her that there was still someone being held in the garage." In light of all evidence, we agree with the circuit court that Tiegen's testimony was merely cumulative, it tended to impeach other witnesses, and it would not have affected the outcome of the trial.

[¶21.]     Corean, however, emphasizes that Tiegen testified that Klug was dead by 3:00 p.m. on Tuesday, July 13. Corean argues that because Klug "was dead prior to [her] knowledge [of the kidnapping], Corean obviously [can] not be guilty of any kidnapping or murder charge." Corean contends that Finding # 40 – in which the circuit court found that Tiegen's testimony "regarding the time of the death of Troy Klug lacks credibility," – is clearly erroneous. We disagree.

[¶22.]     Tiegen's credibility was highly suspect. Kindall testified that at the time of the kidnapping, Tiegen: had been using methamphetamine; had been awake

for approximately one week; and, was not thinking clearly. We also observe that Tiegen essentially conceded bias, testifying that (1) Corean was the only one who had not testified against him, (2) he bargained for a plea agreement for Corean, and (3) he believed Corean was wrongly convicted, "really [getting] a raw deal." Finally, a number of witnesses contradicted Tiegen. The circuit court noted, "[t]he testimony of James Kusick, Eric Haar and Abigail DeJong regarding the time of death [was] corroborated by the testimony of Dr. Neal Haskell, an entomologist, who found that Troy Klug's death occurred on Wednesday, July 14, 2004, at the earliest."[6] Cook also testified that Troy Klug was still alive on the morning of Wednesday, July 14. Therefore Finding # 40 was not clearly erroneous.[7] We agree

---

6. Although Corean argues that "the entomologist's testimony was based on an erroneous date provided to the entomologist by the prosecution," the circuit court's findings reflect that it considered not only the entomologist's opinion, but also the testimony of Cook, Haar, Kusick, and DeJong in making its findings regarding the time of death. Further, the court provided an instruction informing the jury that: "You are not bound to accept an expert's opinion as conclusive, but should give to it the weight to which you find it to be entitled. You may disregard any such opinion if you find it to be unreasonable."

7. Corean also argues that Finding # 26 is clearly erroneous. In that finding, the court found: "Eric Haar and Kusick returned to the Kusick/Corean residence on Tuesday afternoon at sometime between 4:00 p.m. and 5:00 p.m. At that time they observed [Klug] alive in the garage in the [tool] box." Corean claims that Kusick and Haar never testified that Klug was alive at that time. Our review of Kusick's and Haar's testimony supports Corean's claim. Kusick testified that he saw Klug only "from a distance" when Haar opened the tool box. Kusick did not testify that he observed Klug alive at that time. Similarly, Haar never testified that he saw Klug alive. Rather, Haar said that he "only caught a glimpse" of Klug before he shut the tool box, and that "there was no movement, no nothing." Regardless of whether these two witnesses observed Klug alive on Tuesday afternoon, Kusick testified that on Tuesday morning, Corean knew that Klug was in the tool box. And, other witnesses established that Corean was aware of and aided Klug's

(continued . . .)

with the circuit court's finding that: "Tiegen's testimony [had] no impact on the issue of Corean's knowledge of Troy Klug's presence in her garage at a time when Troy Klug was alive and at a time when Corean had an opportunity to intervene on Troy's behalf[.]"[8] For these reasons, the circuit court did not abuse its discretion in denying Corean's motion for a new trial.

[¶23.] Corean also argues that a new trial is required because the State committed a *Brady* violation. Corean contends that the State, through its "actions" in pursuing a capital-murder charge against Tiegen, caused Tiegen to exercise his Fifth Amendment rights, "prevent[ing Corean] from obtaining the [exculpatory] evidence Tiegen had to provide" until after her trial. *See generally Rodriguez v. Weber*, 2000 S.D. 128, ¶ 14, 617 N.W.2d 132, 138 ("Due process under the Fourteenth Amendment of the United States Constitution, and Article VI, § 2 of the South Dakota Constitution, requires the State to reveal exculpatory evidence to the

_____

(. . . continued)
  imprisonment Tuesday afternoon and evening. Finally, the jury heard Cook's testimony that Klug was still alive on Wednesday.

8.  Corean objects to Findings ## 24 and 25, in which the court found that according to Agent Gromer's testimony, "Corean told [Kusick] that she did go back [to the garage] in the morning and that she checked and Tiegen was gone and she locked everything up." The court then found that "Tiegen never mentioned that the garage was locked and offered no explanations to how he was able to even get in the garage which Corean claimed was locked." Corean claims that these findings are erroneous because Agent Gromer testified only that "[Kusick] had told [Corean] to check and lock up the shed. I don't remember if she said she did that; but I *assumed* that she [did] because [Kusick] told her to." (Emphasis added.) Regardless of this ambiguity, the jury heard Corean's own testimony (originally provided at Tiegen's trial) that she returned to her house later Tuesday morning and locked the garage.

defense." (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215, 218 (1963))). In considering whether a *Brady* violation has occurred, three questions must be answered:

> 1. Was the evidence at issue favorable to the Defendant because it is exculpatory or impeaching;
> 2. Was the evidence suppressed by the State either willfully or inadvertently; and
> 3. Did prejudice ensue from the suppression.

*State v. Piper,* 2006 S.D. 1, ¶ 19, 709 N.W.2d 783, 795. If all three questions are answered in the affirmative, a circuit court must grant a new trial. *Id.*

[¶24.]     Corean argues that Tiegen's testimony was unavailable at her trial because the State's action in prosecuting Tiegen for first-degree murder as a capital offense delayed his guilty plea. But Corean cites no authority suggesting delay caused by a collateral prosecution constitutes State action withholding evidence within the meaning of *Brady*. More importantly, the State was not the cause of Corean's inability to acquire Tiegen's testimony. Tiegen testified that at the time of Corean's trial, he had already been offered the plea agreement that eliminated a possible death sentence. Therefore, the State's decision to initially pursue a capital murder prosecution did not delay the availability of Tiegen's testimony. As Tiegen conceded, the State had removed the death-penalty potential through its plea offer, and Tiegen simply elected "not to accept [the plea agreement] at that time." Consequently, even if a *Brady* violation could occur as the result of a collateral prosecution, Corean failed to establish that any State action caused a *Brady* violation.

*II. Whether the circuit court erred in admitting co-conspirator statements.*

[¶25.]     The State introduced three letters that Tiegen wrote to Kindall and Cook while Tiegen was incarcerated in the Pennington County jail. The circuit court admitted the letters under SDCL 19-16-3(5) (Rule 801(d)(2)) as statements of co-conspirators. SDCL 19-16-3(5) (Rule 801(d)(2)) provides that "[a] statement is not hearsay if it is offered against a party and is . . . [a] statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." A circuit court's "decision to admit [ ] statements under SDCL 19-16-3(5) is reviewed under the clearly erroneous standard." *Tiegen*, 2008 S.D. 6, ¶ 27, 744 N.W.2d at 588.

[¶26.]     "Statements made by a co-conspirator are admissible whether or not a conspiracy has been charged." *State v. Smith*, 353 N.W.2d 338, 342 (S.D. 1984). "When there is substantial evidence of a conspiracy, whether the offense charged is conspiracy or not, everything said by [a] conspirator in furtherance of the common purpose is deemed to have been said [on] behalf of all parties to the conspiracy." *State v. Kidd*, 239 N.W.2d 860, 864 (Iowa 1976). "A statement by a co-conspirator of a party during the course and in furtherance of the conspiracy is thus admissible against the party as an admission." *Id.* It is settled that "[t]o satisfy the test of admissibility [under SDCL 19-16-3(5) (Rule 801(d)(2))], there need only be a showing that there is some reasonable basis for concluding that the statement was made in furtherance of the conspiracy." *Tiegen*, 2008 S.D. 6, ¶ 27, 744 N.W.2d at 588. "Once a conspiracy ha[s] been shown, the burden is upon the conspirator to show it has ended." *Kidd,* 239 N.W.2d at 864.

[¶27.] The first letter was from Tiegen to Kindall. The letter advised, "just remember. Do not discuss you[r] case with anyone!" Tiegen cautioned: "You also need to realize that the interview room (where you talk to your lawyer) is bugged. They can't use the tapes but what they hear could send them places we don't need them going!" Tiegen then warned Kindall: "There are some people we don't want to put any further pressure on. Ok. (James [Kusick] and Jamie [Corean].) Savvay?"[9]

[¶28.] The circuit court ruled that this letter was "a clear instruction to Kindall in furtherance of the conspiracy to conceal the crime." It found that it was "a clear instruction that [Kindall] conduct herself so that co-conspirators, [Kusick] and [Corean], are not implicated or involved." More specifically, "[t]his correspondence [was] meant to conceal Kusick and [Corean] and the conspiratorial activities that occurred on July 13, 2004, involving the kidnapping and murder of Troy Klug." We agree. "A conspiracy does not terminate with the commission of the underlying overt act. It continues thereafter so as to include not only the substantive offense but also acts and declarations directed at concealing that offense." *State v. Jenner,* 434 N.W.2d 76, 82 (S.D. 1988). "The reason for including

---

9. In addition to her hearsay objection, Corean objected to this letter, pointing out that at the post-trial hearing Tiegen testified it was his handwriting but he did not remember writing the letter. Corean also pointed out that the words "(James and Jamie.) Savvay?" are lighter in color, and Tiegen testified that he could not remember if he wrote those words. But there was evidence from which the jury could have concluded that Tiegen authored the entire letter. Janice Tweedy, a forensic document examiner, testified: "I looked at that area because it was lighter than the other area around it." She opined: "I didn't see any evidence of it being a simulation or a forgery."

these subsequent efforts at concealment is that such acts and declarations further the conspiracy by allowing the co-conspirators to escape punishment." *Id.*

[¶29.]     The second letter was from Tiegen to Cook while both were incarcerated in the Pennington County jail.  Tiegen wrote: "Even if they do find some so-called physical evidence, where the hell are they going to get their DNA to compare it to?"  He assured Cook: "If we were to be convicted they would have to find the guy.  And believe me they ain't gonna find nobody unless someone else planted somebody."  Tiegen then bragged: "It may have taken me a while to decide what to do but once I figured it out, it was the best plan, and I exercised it with grinding precision."  Tiegen concluded: "Don't worry about them finding a body!"

[¶30.]     The circuit court found these statements were "boasts . . . used by [Tiegen] to obtain the confidence of one involved in the conspiracy."  The court further found these statements "were made by a co-conspirator (Tiegen) to allay apprehension that Cook may have . . . to insure future good relations among the co-conspirators."  We agree with the circuit court's ruling.  Bragging, "puffing, boasts, and other conversation . . . are admissible when used by the declarant to obtain the confidence of one involved in the conspiracy." *Smith*, 353 N.W.2d at 344.  With regards to Tiegen's statement to not "worry" about finding a body, "[s]tatements made by a co-conspirator to allay suspicions are admissible . . . as are statements made by a co-conspirator to allay apprehensions that potential co-conspirators may have with respect to the conduct of another co-conspirator and designed to ensure future good relations among the co-conspirators." *Id.*

[¶31.]      The third letter was from Tiegen to Cook (nicknamed "Chopper") stating: "Yeah, you know that this was one of the nastiest things I have ever done . . . one of the nastiest. . . .  If a guy's gonna make fish food he just as well put it in bite-size pieces right!"  Tiegen went on: "What the hell.  It wasn't my first rodeo and I'm sure it won't be my last if I stay in the business I've been in."  He then told Cook: "I want you to know Chopper you are now a part of a group that is bigger and more powerful than you will ever know."  And: "When we make it through this it will be official."

[¶32.]      The circuit court also found these statements "were made by a co-conspirator (Tiegen) to obtain the continuing confidence of another co-conspirator (Cook)," and that they were "efforts to conceal the crime."  We agree.  Like the second letter, this letter amounted to "puffing, boasts, and other conversation" that Tiegen used to obtain the confidence of a co-conspirator.  *See id.*  The statements were also made "by a co-conspirator to allay apprehensions that potential co-conspirators may have with respect to the conduct of another co-conspirator and designed to ensure future good relations among the co-conspirators."  *See id.*

[¶33.]      Corean, however, argues that the letters were inadmissible because "she was not a co-conspirator of Tiegen's under any theory," and that the State failed to meet its burden of proving that Corean was part of a conspiracy to kidnap Klug.  We disagree.

[¶34.]      There is no dispute that Tiegen and Kindall conspired to kidnap and murder Klug.  And:

> It is well settled that where the existence of a conspiracy is
> shown, only slight additional evidence is required to connect a

particular defendant with the conspiracy. A single act may be the foundation for drawing an actor within the ambit of a conspiracy if that act is such that one may reasonably infer an intent to participate in the unlawful enterprise.

*Estate of Gibbs,* 490 N.W.2d 504, 508 (S.D. 1992). Further, "because conspiracy by its very nature is often not susceptible to proof by direct evidence, the existence of an agreement may be inferred from all the surrounding facts and circumstances, including the acts and declarations of the alleged co-conspirators that may be indicative of their concerted action toward a common unlawful goal." *Jenner,* 434 N.W.2d at 81-82. Therefore, when a defendant "is present at the scene of a crime, any conduct promoting or facilitating, however slightly, the commission of a crime," may be sufficient. *Estate of Gibbs,* 490 N.W.2d at 508.

[¶35.]      In this case, the evidence established that Corean was at her house when Tiegen arrived with Klug in the trunk of the car. Thereafter, Kusick informed her that Klug had been kidnapped by Tiegen and Klug was being held against his will in her garage. We agree with the circuit court's observation that Corean's participation in the conspiracy was established by:

> Testimony of Eric Haar, James Kusick, Tell Cook and Agent Gromer that a conspiracy existed between [Corean], Tory Tiegen and others of July 13, 2004. . . . Shortly after Tiegen and Kindall arrived at [Corean's] home, [Corean] was clearly aware that Klug had been kidnapped by them and was being held against his will. [Corean] knew that Troy Klug was bound and gagged in a tool box at her residence. [Corean] knowingly joined, participated, and perpetuated the kidnapping by providing her residence as a sanctuary for their use while Klug remained on her property. [Corean] adopted the purposes and objects of the conspiracy by knowingly engaging in actions which furthered the object and purpose of the conspiracy.

We also observe that DeJong testified that Corean knew that Klug was bound and gagged inside the tool box. And, despite DeJong's pleas to call the police, Corean refused, telling DeJong that "the cops [would] get them"; and later, that they needed to establish an alibi. This evidence was sufficient to establish Corean's participation in the conspiracy.

[¶36.] The circuit court also admitted the letters under the residual hearsay exception. That exception provides in part:

> A statement not specifically covered by any of §§ 19-16-30 to 19-16-34, inclusive, but having equivalent circumstantial guarantees of trustworthiness, is not excluded by § 19-16-4 if the declarant is unavailable as a witness and if the court determines that:
>
> (1) The statement is offered as evidence of a material fact;
> (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
> (3) The general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

SDCL 19-16-35 (Rule 804(b)(6)). "The primary requirement of SDCL 19-16-35 [(Rule 804(b)(6))] is that the declarant be unavailable to testify at trial." *State v. Davi,* 504 N.W.2d 844, 849 (S.D. 1993). In addition to the other statutory requirements, and to establish that the statements bear the appropriate guarantee of trustworthiness, a circuit court should consider (1) the written or oral nature of the evidence, (2) the character of the statements, (3) the relationship between the declarant and the witness, (4) the declarant's motivation, and (5) the circumstances under which the statements were made. *Id.*

[¶37.]    Corean contends that trustworthiness was not established. In admitting the letters, however, the circuit court applied the required factors, finding:

> Having found Mr. Tiegen to be unavailable, I find that the information, the statements in the letters have circumstantial guarantees of trustworthiness; these are statements between co-conspirators; between friends, as a matter of fact. I also find the evidence, the hearsay goes to evidence of a material fact. I also find that it's more probative than any other available evidence, obviously, if Mr. Tiegen being unavailable, his statement can come in, but these letters were sent back and forth between prisoners, between Mr. Tiegen and Ms. Kindall and Mr. Tiegen and Tell Cook. I also find that the general purpose of the hearsay rule and the interest of justice would be served by their admissions.

The court further found that the statements and letters "were trying to keep the conspiracy going and trying to hide it." The court finally found:

> [T]hey were co-conspirators, partners in crime, if you will and the motivation in making the statements certainly was continuing the conspiracy and some of that analysis that I made previously, also sets [sic]; and again, the circumstances under which the declarant made the statement[s], again, they were both in jail, they were friends, they are co-conspirators; they need to be communicating about the things that are very relevant and material to this case.

Under these circumstances, the circuit court did not abuse its discretion in admitting the letters as statements of co-conspirators under SDCL 19-16-3(5) (Rule 801(d)(2)) and as residual hearsay under SDCL 19-16-35 (Rule 804(b)(6)).[10]

---

10.    Corean argues that the letters are not relevant. We disagree. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SDCL 19-12-1 (Rule 401). Here, the letters were relevant because they established elements of the underlying criminal offenses of kidnapping and first-degree murder, elements that the

(continued . . .)

*III.    Jury Instructions*

[¶38.]        Corean objected to several instructions.[11]  Instructions are sufficient when, viewed as a whole, they correctly state the law and inform the jury.  *State v. Moss*, 2008 S.D. 64, ¶ 23, 754 N.W.2d 626, 634.  "A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard."  *State v. Cottier,* 2008 S.D. 79, ¶ 7, 755 N.W.2d 120, 125.  To constitute reversible error, the instructions must not only be erroneous but also prejudicial.  *Id.*

[¶39.]        Corean objected to an instruction on admissions, arguing that none of her out-of-court statements rose "to the level of an admission."  The circuit court overruled Corean's objection, noting her presence at the scene and her conversations concealing that Klug was being held against his will.  The court ruled that the jury should decide "whether or not any of these statements were admissions, [and] whether the statement [was] true in whole or in part."

---

(. . . continued)
    State was required to prove to convict Corean of aiding and abetting aggravated kidnapping and accessory to murder.

11.    Corean also makes a general objection to the instructions as a whole, arguing that they were incorrect, misleading, confusing, and prejudicial.  Because Corean does not identify how the instructions were incorrect, misleading or confusing as a whole, and because she cites no authority on this issue, we decline to address her general objection.  *See State v. Pellegrino*, 1998 S.D. 39, ¶ 22, 577 N.W.2d 590, 599 (providing that the failure to cite supporting authority on appeal is a violation of SDCL 15-26A-60(6) and the issue is thereby waived).

[¶40.] "[A] criminal admission is 'avowal of a fact or of circumstances from which guilt may be inferred[.]' Admissions are 'the words or acts of a party-opponent, or of his predecessor or representative, offered as evidence against him.'" *State v. Sabers*, 442 N.W.2d 259, 265 (S.D. 1989) (quoting *State v. Stuck*, 434 N.W.2d 43, 54 (S.D. 1988)). Therefore, an admission may include inferences from demeanor, conduct, and acts of a defendant.

[¶41.] Here, a jury could have inferred guilt from Corean's acts and statements. Kusick testified that Corean knew that Klug was being held in her garage, but she did not do anything to help him. Further, DeJong testified that she told Corean more than once that they should try to help Klug, but Corean refused, concealing the kidnapping and indicating that the parties should establish an alibi. The jury could have inferred guilt from these acts and statements because they evidenced Corean's knowledge and intent to provide a sanctuary for Tiegen to restrain Klug. The circuit court did not err in giving an instruction on admissions.

[¶42.] Corean also objected to the court's instruction on accomplices. That instruction provided in part:

> To render a person an accomplice, the person must in some manner knowingly and with criminal intent have aided and abetted or have advised and encouraged the commission of the criminal act charged. . . . Whether or not any witness in this case was an accomplice as defined in these instructions is for the jury to determine from all the evidence in this case. However, you are instructed that as a mater [sic] of law *James Kusick and Cynthia Kindall* are to be considered accomplices.

(Emphasis added.) Corean argues that the circuit court should have instructed that DeJong, Haar, and Cook were also accomplices as a matter of law. Corean argues prejudice because such an instruction would have required that these additional

witnesses' testimony be corroborated. *See* SDCL 23A-22-8 ("A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence which tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."). The circuit court declined Corean's request, ruling that it was a fact question for the jury whether the "people other than Mr. Kusick and Ms. Kindall" were accomplices.

[¶43.] "Whether an individual is an accomplice may be a question of law for the court or a question of fact for the jury, depending on the state of the evidence." *State v. Busack*, 532 N.W.2d 413, 415 (S.D. 1995). "If the facts as to a witness' alleged participation in the crime are disputed or susceptible to different inferences, the question is one of fact for the jury; otherwise, it is a question of law." *Id.*

[¶44.] "An accomplice is one who is liable to prosecution *for the identical offense charged against the defendant on trial.*" *Id.* at 415-16. An accomplice must be "legally accountable" for the underlying offense. *Id.* at 416. In this case, DeJong, Haar, and Cook were neither convicted of nor pleaded guilty to the identical offenses charged against Corean. Both Haar and DeJong entered into plea agreements under which they were not charged and were given immunity, and Cook pleaded to misdemeanor misprison of a felony. Additionally, Corean has not identified other evidence suggesting that DeJong, Haar, or Cook were legally accountable for the underlying offenses as a matter of law. Rather, their level of participation in the events surrounding the murder and kidnapping was susceptible

to different factual inferences. Consequently, the circuit court correctly concluded that it was a jury question whether those individuals were accomplices.

[¶45.] Corean has also failed to establish prejudice. The jury was instructed that "[w]hether or not any witness in this case was an accomplice as defined in these instructions is for the jury to determine from all the evidence in this case." The jury was also instructed on the need for corroboration of accomplice testimony. We must infer that the jury followed those instructions in determining the corroboration necessary to support the verdict. *See generally State v. Olhausen*, 1998 S.D. 120, ¶ 11, 587 N.W.2d 715, 718. The circuit court did not prejudicially err in declining to instruct that DeJong, Haar, and Cook were accomplices as a matter of law.

[¶46.] The court's instruction on accessory provided:

> In the crime of being an accessory to a crime the defendant must render assistance to another with the specific intent to hinder, delay or prevent the discovery, detention, apprehension, prosecution, conviction or punishment of the other for the commission of a crime. Unless the defendant acted with that specific intent, the crime was not committed.

Over Corean's objection, the circuit court removed the last sentence of the South Dakota pattern jury instruction on accessories, which would have also told the jury that "there must exist a union or joint operation of acts or conduct and a certain specific intent." The circuit court removed this language, ruling that it was surplusage and confusing.

[¶47.] To be an accessory, Corean need only have rendered assistance "with intent to hinder, delay, or prevent the discovery, detection, apprehension, prosecution, conviction, or punishment of another for the commission of a felony."

SDCL 22-3-5. "Rendering assistance" includes "[o]bstruct[ing] anyone by . . . deception in the performance of any act which might aid in the discovery, detection, apprehension, prosecution, conviction, or punishment of the other person[.]" SDCL 22-3-5(4).

[¶48.] The court's instruction provided that the crime required both rendering assistance to another and specific intent to "hinder, delay, or prevent the discovery, detection, apprehension, prosecution, conviction or punishment" of another. Therefore, Corean's requested language on joint operation of acts or conduct and specific intent was duplicative of the court's instruction. Instructions that are duplicative or surplusage do not warrant reversal of a jury verdict. *See State v. McVay,* 2000 S.D. 72, ¶ 18, 612 N.W.2d 572, 576; *Cody v. Edward D. Jones & Co.*, 502 N.W.2d 558, 564 (S.D. 1993). We fail to see, and Corean fails to articulate, how the circuit court's reasoning for striking the last sentence was in error.

[¶49.] Corean objected to the court's instruction on aiding and abetting kidnapping. "Any person who, with the intent to promote or facilitate the commission of a crime, aids, abets, or advises another person in planning or committing the crime, is legally accountable, as a principal to the crime." SDCL 22-3-3. The court's instruction provided in relevant part:

> One of the elements of the crime of kidnapping as charged in Count 3 of the indictment is that the defendant's purpose was to facilitate the commission of a felony.
>
> The crimes of murder, aggravated assault, possession of a controlled substance and maintenance of a place for the use of controlled substances are all felony offenses.
> * * *

> A person commits the offense of maintaining a place for the use of controlled substances when the person knowingly keeps or maintains any place which is resorted to by persons using controlled drugs and substances for the purpose of using such substances or which is used for the keeping or selling of a controlled drug.

Corean objected to the last paragraph of the instruction that included possession of a controlled substance and maintaining a place for the use of controlled substances as underlying felonies. The circuit court overruled the objection, finding evidence that all four felonies could have been the purpose for the kidnapping and murder.

[¶50.] On appeal, Corean argues that Tiegen did not commit the kidnapping to maintain a place for the use of controlled substances.[12] A circuit court should instruct the jury on issues "supported by competent evidence in the record[.]" *Johnson v. Armfield*, 2003 S.D. 134, ¶ 7, 672 N.W.2d 478, 481. Whether the evidence was sufficient to support an instruction is viewed "in the light most favorable to upholding the verdict." *Id.*

[¶51.] In this case there was sufficient evidence that the kidnapping took place for the purpose of keeping or facilitating Tiegen and Kindall's drug activities at Kindall's and Corean's houses. Regarding Kindall's house, there is no dispute that both Tiegen and Kindall were in the illicit drug business from Kindall's house in Rapid City. Tiegen testified that he had been staying at Kindall's house for about a week, and Klug came over to Kindall's house on Monday to purchase methamphetamine. Kindall admitted having sold drugs to Klug, and Klug had

---

12. Although Corean objected to the court's instruction that included the felony of possession of a controlled substance, Corean has not objected to that portion of the instruction on appeal.

owed her money for drugs for about two to three years. Beebe testified that Kindall was a drug supplier and had supplied Beebe with methamphetamine. Beebe further testified that Klug had sold drugs for Kindall and Kindall was Klug's supplier. Kusick testified that he had also purchased drugs at Kindall's house and Tiegen was supplying methamphetamine to both Kusick and Corean. Considering Klug's lengthy drug debt to Kindall, together with Tiegen's statement that Klug had become "a rat, a snitch," the jury could have inferred that the murder and kidnapping occurred to foster and maintain Tiegen and Kindall's drug business at Kindall's house.

[¶52.]     There was also evidence that Tiegen, Kindall, Corean and others were using Corean's house as a place to use illegal drugs. DeJong testified that before Tuesday, July 13, she had seen Tiegen at Corean's house using drugs. DeJong also testified that Corean's house was the place where "quite a few" people went to use illegal drugs. Considering all the evidence, a jury could have inferred that the kidnapping occurred because Klug was a "snitch," and Tiegen and Kindall wanted to perpetuate the use of Corean's house for the sale and use of controlled substances. We conclude that the circuit court did not abuse its discretion in submitting an instruction that included maintaining a drug premises as a purpose for the kidnapping.

*IV. Whether there was sufficient evidence to sustain Corean's convictions*

[¶53.]     Corean claims that there was "no evidence introduced at trial" to sustain her convictions. Her claim is viewed in the light most favorable to the verdict. *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342. The question is

whether "there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *Id.* This Court will not resolve conflicts in the evidence, assess the credibility of witnesses, or reevaluate the weight of the evidence. *Id.* "If the evidence including circumstantial evidence and reasonable inferences drawn therefrom sustain[s] a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.*

[¶54.] Contrary to Corean's claim, there was sufficient evidence that she aided and abetted Klug's kidnapping. Kusick testified that he talked to Corean at least a "couple of times" about Klug being held in the tool box. DeJong testified that (1) Corean told DeJong on Tuesday evening "that there was somebody being held in the shed," (2) Corean told DeJong not to call the police, and (3) Corean talked to DeJong about establishing an alibi. Finally, Haar testified that he, Corean, and DeJong discussed "the body in the box" on Tuesday evening and reached an agreement "not to say anything about it." Ultimately, Kusick, Haar, and DeJong all implicated Corean. As the circuit court correctly observed, the jury could have inferred that Corean aided and abetted Tiegen by allowing her house to be used as a sanctuary to facilitate the kidnapping.

[¶55.] There was also sufficient evidence to sustain Corean's accessory to murder conviction. DCI Agent Gromer testified that when the police interviewed Corean in September 2004, Corean lied regarding the type of vehicle that Tiegen was driving on Tuesday morning. She informed the police that Tiegen was driving a red pickup, as opposed to Kindall's black Nissan that was used to transport Klug. Agent Gromer testified:

> [W]e got to talking again about Thursday or excuse me, Tuesday morning when Tiegen had came [sic] early in the morning and at that point in time she said that [Tiegen] was driving a red pickup. And said that she remembered that because she walked by it as she walked out of the house that morning to go to work.

When Agent Gromer was asked if Corean's statement surprised him, he replied, "It did because earlier she had said that he was driving the black Nissan." Agent Gromer testified that he then asked Corean about this discrepancy, and Corean told him that "she was sure that it was a red and silver pickup." Agent Gromer further testified that the day after this interview, he stopped at Corean's work, showed her a photograph of Tiegen's pickup, and Corean "identified the pickup as the one that was at her house." The jury could have concluded that this was deception by Corean intended to assist Tiegen by obstructing the authorities' investigation. *See supra* ¶ 47 (setting forth the elements of an accessory under SDCL 22-3-5 and 22-3-5(4)).

[¶56.]     Corean also argues that the evidence was insufficient because there was no corroborative evidence of accomplice testimony. "[T]here is[, however,] no requirement that every material fact testified to by [an] accomplice be confirmed by corroborative evidence." *State v. Smithers*, 2003 S.D. 128, ¶ 33, 670 N.W.2d 896, 903. "The rule is satisfied if such evidence in some substantial degree (1) tends to affirm the truth of the testimony of the accomplice, and (2) tends to establish the guilt of the defendant. Circumstantial evidence may be sufficient to corroborate the testimony of an accomplice[.]" *State v. Giuliano*, 270 N.W.2d 33, 39 (S.D. 1978). "Where such evidence of corroboration appears, its weight, credibility, and sufficiency is for the jury." *Id.*

[¶57.]    We initially observe that Corean's own testimony corroborated other witnesses. Corean admitted that Tiegen was at her house on Tuesday morning and that she left work to check if Tiegen had left and to lock the garage. Corean also admitted that Tiegen was a good friend and that he had been providing her with methamphetamine. She further admitted that Tiegen was at her house with the black Nissan. Nevertheless, Agent Gromer indicated that Corean lied or covered-up her participation. Corean declined to tell him anything about her actions or seeing Tiegen. Corean further confirmed that DeJong was a good friend of hers, and that it was possible that several of the witnesses, including DeJong, were at her house on Wednesday. That would have placed those witnesses in a position from which they could have made the observations they related at trial.

[¶58.]    Additionally, the kidnapping and murder were clearly corroborated. And, with respect to Corean's defense regarding untimely knowledge of the kidnapping, the circuit court found that "[t]he [impeaching] testimony of James Kusick, Eric Haar and Abigail DeJong regarding the time of death [was] corroborated by the testimony of Dr. Neal Haskell, an entomologist, who found that Troy Klug's death occurred on Wednesday, July 14, 2004, at the earliest."

[¶59.]    Finally, as previously noted, it is significant that Kusick, Haar, and DeJong have never been convicted of the offenses for which Corean was tried, and they were not accomplices as a matter of law. Therefore, it was for the jury to determine whether their testimony required corroboration. *See supra* ¶ 45. Considering all the evidence, together with the fact that it was the jury's prerogative to determine whether corroboration was even necessary, there was

sufficient evidence for the jury to have convicted Corean. *See Olhausen,* 1998 S.D. 120, ¶ 11, 587 N.W.2d at 718 ("The testimony of the accomplice need not be validated by evidence adequate to carry a conviction."). As indicated by the circuit court at sentencing, "I sat through the trial and find more than sufficient credible evidence to support both verdicts." The evidence and the natural inferences drawn therefrom sustain a reasonable theory of guilt. *See Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d at 342.

*V. Whether Corean's sentence constitutes cruel and unusual punishment*

[¶60.]      Corean argues that her mandatory life sentence for aiding and abetting aggravated kidnapping is cruel and unusual punishment because it is grossly disproportionate to the crime and to the other parties' sentences. She also asserts gross disproportionality because she alleges the sentence was more than necessary to protect the public and provide for rehabilitation, and that the court failed to consider mitigating circumstances.

[¶61.]      But aiding and abetting aggravated kidnapping is a Class A felony. As indicated by the circuit court in pronouncing her sentence, "[t]here is no discretion; there is no leniency that can be given under the law. . . . The law is clear, it's a Class A felony, life imprisonment and no possibility of parole under that sentence." *See* SDCL 22-6-1(1) ("A lesser sentence than death or life imprisonment may not be given for a Class A.").

[¶62.]      We have previously acknowledged that no downward departure is permitted under mandatory sentencing even "if mitigating circumstances exist[ed]." *See State v. Smiley*, 2004 S.D. 119, ¶ 3, 689 N.W.2d 427, 429. This Court has

rejected the arguments that a mandatory life sentence violates the Eighth Amendment and that a sentencing court should retain discretion to consider mitigating factors to allow for a sentence less than life. *See Owens v. Russell,* 2007 S.D. 3, ¶ 29, 726 N.W.2d 610, 620. Notwithstanding this inability to consider mitigating factors, "[t]here is no constitutional basis" for Corean's arguments: they "should be addressed to the [L]egislature." *See id. See also Harmelin v. Michigan,* 501 U.S. 957, 995, 111 S.Ct. 2680, 2701, 115 L.Ed.2d 836 (1991) (stating that the defendant's "'required mitigation' claim, like his proportionality claim, does not find support in our death penalty jurisprudence"); *Steichen v. Weber*, 2009 S.D. 4, ¶ 30, 760 N.W.2d 381, 394 (stating that, when asked to review the proportionality of a sentence, this Court gives the "utmost deference to the Legislature").

[¶63.] We believe the same principles apply to a mandatory life sentence for kidnapping. "The Legislature sanctioned life imprisonment for particularly egregious conduct such as kidnapping[.]" *State v. Guthmiller*, 2003 S.D. 83, ¶ 45, 667 N.W.2d 295, 310. In upholding a life sentence for kidnapping, Iowa has recognized that "[k]idnapping is one of the most serious of all crimes. By its very nature it involves violence or forcible restraint." *Lamphere v. State*, 348 N.W.2d 212, 220 (Iowa 1984) (citing *In re Maston,* 33 Cal.App.3d 559, 563, 109 Cal.Rptr. 164, 167 (1973)). Thus, "[t]he severity of punishment . . . can be explained by the degree to which the legislature has deplored this [ ] crime." *Id.* The Eighth Circuit has found that a legislatively mandated life sentence for kidnapping is severe, but it is not "so disproportionate to the crime as to be unconstitutional." *Hatter v. Iowa Men's Reformatory*, 932 F.2d 701, 703 (8thCir. 1991). Even more to the point, the

Eighth Circuit has found that a legislatively mandated life sentence for aiding and abetting kidnapping is not grossly disproportionate. *See Simmons v. State of Iowa*, 28 F.3d 1478, 1483 (8thCir. 1994) (concluding "that the Iowa mandatory sentence of life imprisonment without parole is not grossly disproportionate to [defendant's] crime of aiding and abetting the restraint and torture of her seven-year-old child"). Similarly, we have concluded that a mandatory life sentence for conspiracy to commit a murder that never came to fruition was not cruel and unusual punishment. *See State v. Kaiser,* 526 N.W.2d 722, 726 (S.D. 1995) (analyzing the issue under the shock-the-conscience test).

[¶64.]    The Supreme Court has noted that, outside the context of capital cases, the proportionality principle only comes into play in the extreme example, if for example a legislature made overtime parking a felony punishable by life imprisonment. *Ewing v. California*, 538 U.S. 11, 21, 123 S.Ct. 1179, 1185, 155 L.Ed.2d 108 (2003). Corean's case is not such an extreme example. Considering the torture and depravity involved in this case, Corean's active participation in facilitating the crime, and the legislatively mandated sentence for this offense, we must defer to the Legislature and reject Corean's gross disproportionality argument.

[¶65.]    Affirmed.

[¶66.]    GILBERTSON, Chief Justice, and KONENKAMP, MEIERHENRY, and SEVERSON, Justices, concur.